

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AB:KCB/TBM/RSB
F. #2017R01960

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 20, 2026

**Request to File Under Partial Seal**

By E-mail and ECF

The Honorable Brian M. Cogan
United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Howard Rubin, et al.
>        Criminal Docket No. 25-281 (BMC)

Dear Judge Cogan:

The government respectfully submits this letter to notify the Court of potential conflicts of interest, and specifically: (1) defendant Howard Rubin's payment of the attorney fees of co-defendants Jennifer Powers and Stephen Powers; (2) Jennifer Powers's lawyers' prior representation, and Rubin's lawyers' current representation, of potential witnesses; and (3) Rubin's representation by a lawyer implicated in certain of his conduct who could become a witness. The government advises the Court of this information pursuant to its obligation under Second Circuit law so that the Court may determine if the conflicts are waivable, and if so, conduct the appropriate inquiries pursuant to United States v. Curcio, 680 F.2d 881, 888-90 (2d Cir. 1982). See United States v. Stantini, 85 F.3d 9, 13 (2d Cir. 1996).

I.        Relevant Background

A.        The Superseding Indictment

On September 17, 2025, a grand jury sitting in the Eastern District of New York returned a ten-count indictment charging Rubin and Jennifer Powers with sex trafficking, in violation of 18 U.S.C. §1591(a), transporting women in interstate commerce for prostitution, in violation of 18 U.S.C. § 2421(a), and, as to Rubin, bank fraud, in violation of 18 U.S.C. § 1344. ECF No. 1. On September 30, 2025, a grand jury returned a superseding indictment adding, as to Jennifer Powers and her husband Stephen Powers, six counts of subscribing to false tax returns, in violation of 26 U.S.C. § 7206(1). ECF No. 21 (the "Superseding Indictment").

As alleged, between approximately 2009 through 2019, Rubin, Jennifer Powers and others operated an extensive network whereby they recruited women to fly to New York to engage in commercial sex with Rubin involving bondage, dominance, submission and sadomasochism, often relying on force, fraud and coercion to cause the women to engage in Rubin's desired sex acts. From 2011 to 2017, Rubin leased a two-bedroom penthouse near Central Park (the "Penthouse") and, with Jennifer Powers's assistance, transformed a second bedroom into a sex dungeon (the "Dungeon"), where many of the criminal sex acts occurred. Jennifer Powers maintained the Dungeon, cleaning it between uses and restocking the equipment. The defendant saw different women for commercial sex multiple times a week, including on consecutive days, and whose flights and accommodations Jennifer Powers typically arranged. During these encounters, the defendant brutalized the women's bodies, often beyond any consent they had given, causing them significant pain and bruising, and at times requiring medical treatment. Often, Jennifer Powers obtained non-disclosure agreements from the women; paid the women using Rubin's money, in amounts dictated by Rubin; and managed fallout with the women following their abuse, among other activities instrumental to the trafficking network.

Since approximately 2012, Rubin has funded virtually all aspects of Jennifer Powers and Stephen Powers's lives. Between 2018 to 2023 alone, Rubin provided Jennifer Powers and Stephen Powers with over $9 million. Among other things, he has paid for the rent on their Manhattan apartment; their children's private school tuition; the down payment and mortgage on their Texas-based home after the Powers relocated to Texas in 2020; Jennifer Powers's legal fees in connection with the trafficking network; and since 2018, he has directly paid their credit card bills.

In late 2017, Rubin and Jennifer Powers were sued civilly for sex trafficking, among other claims (the "Civil Case"), in a case that proceeded to trial in 2022, at which they both testified. Notably, after the filing of the Civil Case, the structure of Rubin and Jennifer Powers's financial relationship fundamentally changed, but the substance did not. Instead of wiring Jennifer Powers money to her bank accounts, Rubin began funding her lifestyle directly, largely by making the mortgage payments on the Texas home and by paying off her and Stepen Powers's credit card bills. Since at least 2014, Rubin, Jennifer Powers and Stephen Powers have failed to report to the Internal Revenue Service any of the money Rubin has provided to the Powers family.

Additionally, Rubin lied to a financial institution to conceal the nature of his relationship with Jennifer Powers. To secure the mortgage on Jennifer Powers and Stephen Powers's home in Texas, which Rubin co-signed, Rubin attested to a financial statement in June 2020 claiming he was not a party to litigation. In fact, he was party to the Civil Case, among others; had been deposed in the Civil Case, as had Jennifer Powers; and he had sat for the depositions of all plaintiffs that had been deposed, as well as that of Jennifer Powers. In April 2022, during the middle of the jury trial in the Civil Case, after he had testified, he attested to a second financial statement submitted to the bank, which did not correct his prior material misrepresentation that he was not party to litigation.

2

B.    Additional Background Regarding Potential Conflicts

1.    Subject #1

Since at least 2011, an individual ("Subject-1") engaged in commercial sexual activity with Rubin. She visited Rubin at the Penthouse and elsewhere, and Jennifer Powers arranged for her flights. Rubin has paid Subject-1 almost $200,000 in total, including as recently as 2020. Additionally, Subject-1 witnessed Rubin engage in criminal sexual activity with others. For example, in 2011, Subject-1 was present while Jane Doe #10[1] was provided drugs, tied up and penetrated by Rubin in a hotel room in Manhattan. (Notably, at the Civil Trial, Rubin offered testimony contradicting that of Jane Doe #10, and claimed that he simply "spanked [Jane Doe #10] once and she hopped up off the bed" and left.) Likewise, Subject-1 was present in 2014 when Rubin raped Jane Doe #10 in the private room of a strip club in Manhattan. (By contrast, at the Civil Trial, Rubin again testified inconsistently with Jane Doe #10, claiming that the sex in the strip club was consensual.)

Since at least November 2024, Subject-1 has been represented by Effie Blassberger of Clayman Rosenberg Kirshner & Linder, LLP in connection with the government's investigation, including grand jury subpoenas served on Subject-1 in October 2024 and September 2025. Counsel for Subject-1 advised the government that, in response to the subpoenas, Subject-1 intended to assert her Fifth Amendment right against self-incrimination.

On December 15, 2025, Isabelle Kirshner of Clayman Rosenberg Kirshner & Linder, LLP filed a notice of appearance on behalf of Rubin. See ECF No. 54.

2.    Yifat Schnur, Esq.

Beginning in at least approximately 2016 through approximately 2018, the lawyer Yifat Schnur represented Rubin and Jennifer Powers.[2]

In September 2016, Rubin used force, fraud and coercion to cause Jane Doe #4 to engage in commercial sex acts with him at the Penthouse, as a result of which Jane Doe #4 sustained lasting damage to her breast implants that required medical attention. Rubin agreed to settle with Jane Doe #4 for tens of thousands of dollars. Schnur prepared the settlement paperwork.

In October 2016, Rubin used force, fraud and coercion to cause Jane Doe #5 to engage in commercial sex acts with him at the Penthouse with the assistance of a co-conspirator ("Co-Conspirator 1"). ██████████████████████

---

[1]    The government refers to the victims in this letter using the same Jane Doe numbering as in the Superseding Indictment.

[2]    The government does not understand Ms. Schnur to still be representing Rubin or Jennifer Powers.

3

██████████[3]  Rubin agreed to pay the legal fees for ██████████ if she did not tell the police who leased the Penthouse and if she left Rubin and Jennifer Powers's names out of the case, to which ██████████ consented.  In a text message to Rubin regarding ██████████'s lawyer, Jennifer Powers wrote, "We probably need someone 'good' since the reason they fought was over you…I'm not sure if anything else would be brought up, drugs, sex, etcccc."

The same month, Rubin suggested to Jennifer Powers that they simply offer to pay off ██████████: "after things cool down next week, I'd like to offer ██████████ 1k to drop the charges against ██████████  We don't need r names thrown around."  In December 2016, he again suggested to Jennifer Powers, "I wonder if we cann get hold of ██████████ and just pay herto drop charges ?"  Jennifer Powers described this to Rubin as a "bribe."

Charges against ██████████ were pursued.  In August 2017, Jennifer Powers sent ██████████ an email to share with ██████████'s lawyer, authorizing the lawyer to share information with Rubin and Jennifer Powers's own lawyer, identified as Schnur.  The email Jennifer Powers drafted read: "I am writing to express authorization for you to discuss my case with another attorney by the name of Yifat Schnur.  You have my express permission to share any and all information in regards to my case with Ms. Schnur.  Ms. Schnur can be reached at [phone number]."

Separately, on or about September 19, 2017, Schnur was provided a copy of a draft complaint in the Civil Case.  Later that same day, Jennifer Powers contacted 1-800-GOT-JUNK.  The company was then scheduled to clear out items in the Penthouse on September 22, 2017, which they did.

Thereafter, Schnur was named as a defendant in the Civil Case, but this Court granted her motion to dismiss because, among other reasons, the plaintiffs in the Civil Case had failed to plead facts supporting RICO predicate acts committed by Schnur and failed to plead that she exerted operational or management control over the RICO enterprise.  See 17-CV-6404 (BMC), ECF No. 105.  In October 2018, following her dismissal from the Civil Case, Schnur filed claims against the Civil Case plaintiffs and plaintiff's counsel in New York State Supreme Court alleging defamation, among other things (the "Defamation Case").  Rubin is funding the litigation on her behalf, but she is required to repay Rubin.  In the Defamation Case, Schnur was formerly represented by counsel at Schlam Stone & Dolan LLP—though different lawyers at that firm than those presently representing Jennifer Powers—until they withdrew.[4]  Schnur is

---

[3]      The government respectfully requests leave to file this letter under partial seal, to protect the identifies of the victims referenced herein.  ████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

[4]      Schlam Stone & Dolan LLP also represented Schnur in related proceedings involving plaintiff's counsel from the Civil Case, until they withdrew.  See In re John G. Balestriere, No. 24-BK-11422 (S.D.N.Y.); Schnur v. Balestriere, No. 24-AP-4036 (S.D.N.Y.).

presently represented in the Defamation Case by Michael Gilbert, one of Rubin's current lawyers at Sheppard, Mullin, Richer & Hampton LLP ("Sheppard Mullin").[5]

### 3.    Threat Letter to Jane Doe #5

In or about January 2019, Rubin learned that Jane Doe #5, whom (as discussed above) he had sex trafficked in October 2016, was going to file a lawsuit against him.  In a letter dated January 10, 2019, which he sent by overnight mail to her parents' house, he wrote, in sum and substance:

> I understand that you are considering suing me in connection with our S&M encounter we had together in October 2016.  Before you do so, I urge you to think about the following: . . . I will testify publicly that you are a professional prostitute who agreed to have S&M sex with me for $5,000 and that you acknowledged that you understood the hazards of engaging in S&M behavior. . . . I plan to countersue the women currently involved and to seek Court imposed sanctions against the women and their attorneys.

(the "Threat Letter").  At the time, Jane Doe #5 was represented by counsel in connection with her impending lawsuit.  Jane Doe #5's counsel was not given forewarning of the Threat Letter or the contact.  On or about January 11, 2019, Rubin emailed Co-Conspirator-1 who had participated in the sexual abuse of Jane Doe #5, attached a copy of the Threat Letter, and wrote, "I texted her and sent a fedex and a registered letter.  We think she lives with her mother in [redacted], but we don't know for sure."  Notwithstanding the Threat Letter, Jane Doe #5 filed a lawsuit against Rubin, which he settled prior to the taking of any testimony.

On October 16, 2025, Rubin filed an application for bail in the instant case in which he reported that, "prior to sending the letter, Mr. Rubin showed it to his counsel, and he did not believe that anything in this letter was improper."  See ECF No. 40 at 15.  On October 27, 2025, Rubin's counsel confirmed that Dechert LLP was the law firm advising Rubin at the time of the Threat Letter.  While Dechert LLP was previously representing Rubin in the instant case, on February 20, 2025, Dechert LLP moved to withdraw, which the Court granted.  See ECF No. 74; Electronic Order dated Feb. 20, 2025.  However, Rubin continues to be represented by Mr. Gilbert, who was with Dechert LLP in 2019.

---

The lawyers handling those cases were likewise different than the Schlam Stone & Dolan LLP attorneys presently representing Jennifer Powers in the instant case.

[5]    Michael Gilbert was a partner at Dechert LLP prior to 2021, after which he became a partner at Sheppard Mullin.  Mr. Gilbert advised that his representation of Schnur began only once he joined Sheppard Mullin.

4.      Attorneys' Fees

On October 17, 2025, counsel for Rubin informed the government that Rubin intended to pay the attorney fees for co-defendants Jennifer Powers and Stephen Powers, who are separately represented, in connection with the instant criminal case.

II.    Applicable Law

A.    Overview

The Sixth Amendment affords a criminal defendant the right to effective assistance of counsel, free from conflicts of interest.  See Wood v. Georgia, 450 U.S. 261, 271 (1981); United States v. Perez, 325 F.3d 115, 124 (2d Cir. 2003).[6]  That right, however, is not absolute and does not guarantee the defendant counsel of his own choosing.  See United States v. Jones, 381 F.3d 114, 119 (2d Cir. 2004); United States v. Locascio, 6 F.3d 924, 931 (2d Cir. 1993).  As relevant here, at least two interests may impose limits on a defendant's right to counsel of his choosing: first, "the essential aim of the [Sixth] Amendment . . . to guarantee an effective advocate for each criminal defendant," and second, the "independent interest" of federal courts "in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."  Wheat v. United States, 486 U.S. 153, 159-60 (1988).

Accordingly, when faced with the possibility of a conflict of interest, the court should engage in a three-step process: (1) inquire into the conflict; (2) to the extent a conflict or potential conflict exists, determine if it is waivable; and (3) if it is waivable and one the defendant wishes to waive, obtain a knowing and valid waiver.

At step one, the court has an inquiry obligation whenever it is "sufficiently apprised of even the possibility of a conflict of interest," which extends to "any sort of conflict." United States v. Levy, 25 F.3d 146, 153 (2d Cir. 1994).  Indeed, "[w]hen a possible conflict has been entirely ignored, reversal is automatic."  Id. at 153; cf. United States v. Malpiedi, 62 F.3d 465, 470 (2d Cir. 1995) ("[W]e emphasize that the government can protect itself by informing the district judge of potential conflicts at the earliest possible moment."); United States v. Iorizzo, 786 F.2d 52, 59 (2d Cir. 1986) (admonishing the government for failing to make a written motion for disqualification in advance of trial and reversing conviction).  During the inquiry stage, "the court must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all."  United States v. Cain, 671 F.3d 271, 293 (2d Cir. 2012).  An actual conflict exists "when the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action, or when the attorney's representation of the defendant is impaired by loyalty owed" to another.  Jones, 381 F.3d at 119.  A potential conflict arises if "the interests of the defendant could place the attorney under inconsistent duties in the future."  Id.  In evaluating an actual or potential conflict, actions of any member of a law

---

[6]      Unless otherwise stated, internal quotation marks and citations are omitted, and alterations are adopted.

firm are imputed to every member of the firm.  See Hempstead Video, Inc. v. Incorporated Village of Valley Stream, 409 F.3d 127, 133, 135 (2d Cir. 2005) (explaining that an "attorney's conflicts are ordinarily imputed to his firm based on the presumption that 'associated' attorneys share client confidences," which presumption can be rebutted).  "If the court is satisfied at the inquiry stage that there is no actual conflict or potential for one to develop, its duty ceases." Cain, 671 F.3d at 293.

At step two, to the extent an actual or potential conflict exists, the court must determine if it is one that may be waived.  The Second Circuit has recognized two per se conflicts that are unwaivable and, if allowed to persist through trial and conviction, on appeal result in automatic reversal without requiring a showing of prejudice: where counsel is not admitted to the bar of any court and where counsel is implicated in the defendant's crimes. Levy, 25 F.3d at 157 n.8.  "If a district court finds that an attorney suffers from an actual or potential serious conflict that does not rise to the level of a per se conflict, it must then go on to determine" whether the conflict is nonetheless unwaivable.  Jones, 381 F.3d at 120.  A conflict or potential conflict is unwaivable and requires immediate disqualification where it is of such a serious nature that "no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation," e.g., where it would fundamentally impair the lawyer's representation. Levy, 25 F.3d at 153.  A court may also find a conflict unwaivable where it "jeopardizes the integrity of the judicial proceedings." Jones, 381 F.3d at 120.[7]

Courts are afforded "substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." Wheat, 486 U.S. at 163.  As the Supreme Court explained:

> [A] district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly.  The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. . . .  A few bits of unforeseen testimony or a single previously unknown or unnoticed

_____

[7]    See United States v. Schlesinger, 335 F. Supp. 2d 379, 384 (E.D.N.Y. 2004) (finding that conflicts—specifically, counsel's representation of potential witness in separate proceeding and allegation that counsel was hired by defendant to facilitate, inter alia, dissemination of fraudulent documents—even if they amounted to "only a lesser actual or potential conflict," could not be waived "as the conflicts would cast doubt on the integrity of the judicial process"); United States v. Wallert, 733 F. Supp. 570, 573 (E.D.N.Y. 1990) (disqualifying lawyer who, inter alia, was underpaid by defendant, supporting inference that defendant had a financial motive for the financial crimes with which he was charged, causing the lawyer to "assume a role that could cause the erosion of the public confidence in the integrity and efficiency of the legal system and the legal profession").

> document may significantly shift the relationship between multiple
> defendants.  These imponderables are difficult enough for a lawyer
> to assess, and even more difficult to convey by way of explanation
> to a criminal defendant untutored in the niceties of legal ethics.

Id. at 162-63; see Cain, 671 F.3d at 294 (noting that "the potential for gamesmanship on the part of the defendant who waives a conflict only to later claim ineffective assistance of counsel, weigh[s] heavily in favor of affording the district court substantial latitude in refusing waivers of conflicts of interest," including where only potential conflicts exist); Jones, 381 F.3d at 120 (acknowledging that trial courts often must decide such issues when it is unclear whether a "potential conflict . . . may ripen into an actual conflict as the trial progresses," which thus requires affording the court "latitude to permit or deny a defendant's waiver of such conflict"); cf. United States v. Scala, 266 F. App'x 41, 45 (2d Cir. 2008) (affirming disqualification of counsel who invoked Fifth Amendment in defense to producing subpoenaed documents as within court's "broad discretion," given lawyer's apparent concern "about his misconduct (or perceived misconduct) relating to [defendant's] case," even though "it was then, and is still now, impossible to confidently predict how these matters might have unfolded").

Accordingly, the determination of whether to reject a waiver and disqualify an attorney is "left primarily to the informed judgment of the trial court," which can evaluate the facts and circumstances of the case.  Wheat, 486 U.S. at 164; Cain, 671 F.3d at 294 ("[T]he evaluation of whether the facts and circumstances of a particular case evince a conflict so serious as to be unwaivable is a discretionary one that is best left primarily to the informed judgment of the trial court.").  On appeal, such decisions are reviewed for abuse of discretion.  Jones, 381 F.3d at 119.  If the court determines "[n]o waiver of the conflict is possible . . . no Curcio hearing is required."  Cain, 671 F.3d at 294.

At step three, to the extent there is a waivable conflict or potential conflict, and one the defendant wishes to waive, the court must obtain directly from the defendant a valid waiver in accordance with the procedures set forth in Curcio.  In summarizing the Curcio procedures, the Second Circuit has instructed the trial court to:

> (i) advise the defendant of the dangers arising from the particular
> conflict; (ii) determine through questions that are likely to be
> answered in narrative form whether the defendant understands those
> risks and freely chooses to run them; and (iii) give the defendant
> time to digest and contemplate the risks after encouraging him or
> her to seek advice from independent counsel.

Iorizzo, 786 F.2d at 59.  The need for a Curcio hearing exists regardless of whether a case is disposed of by way of guilty plea or trial.  See Boria v. Keane, 99 F.3d 492, 497 (2d Cir. 1996).

B.    Specific Conflicts

1.    Third Party Payment of Legal Fees

A conflict may arise when an attorney is paid by a third party, rather than by his or her own client.  "Ethical considerations warn against an attorney accepting fees from someone

other than her client. . . . . [T]he acceptance of such benefactor payments may subject an attorney to undesirable outside influence and raises an ethical question as to whether the attorney's loyalties are with the client or the payor." United States v. Locascio, 6 F.3d 924, 932 (2d Cir. 1993). "Courts and commentators have recognized the inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party." Wood, 450 U.S. at 269-70. See, e.g., United States v. Duran-Benitez, 110 F. Supp. 2d 133, 151-52 (E.D.N.Y. 2000) ("By their very nature, third-party fee arrangements create numerous ethical pitfalls into which even the most wary criminal defense attorney may stumble."); Restatement (Third) of the Law Governing Lawyers § 134(1) ("A lawyer may not represent a client if someone other than the client will wholly or partly compensate the lawyer for the representation, unless the client consents . . . and knows of the circumstances and conditions of the payment."); N.Y. Rules of Prof. Conduct 1.8(f) (2025) ("A lawyer shall not accept compensation for representing a client, or anything of value related to the lawyer's representation of the client, from one other than the client unless: (1) the client gives informed consent; (2) there is no interference with the lawyer's independent professional judgment or with the client-lawyer relationship; and (3) the client's confidential information is protected[.]").

The ethical pitfalls are particularly heightened where the payor "is the operator of the alleged criminal enterprise." Wood, 450 U.S. at 268-69. In such scenarios, one particular "risk is that the lawyer will prevent his client from obtaining leniency by preventing the client from offering testimony against [the payor] or from taking other actions contrary to the [payor's] interest." Id. at 269; see also In re: Grand Jury Subpoena Served Upon John Doe, Esq., 781 F.2d at 248 n.6 (2d Cir. 1986) (en banc) (noting that when "the third party is the head of a criminal enterprise of which the clients are members . . . an ethical question arises as to whether the attorney's loyalties are with the client or the payor"); cf. United States v. Schwarz, 283 F.3d 76, 81, 91-92 (2d Cir. 2002) (reversing conviction where defense counsel's firm's interest in maintaining a lucrative retainer agreement with third party payor constituted an unwaivable conflict, which prejudiced defendant's trial strategy).

2.      Representation of a Witness

"An actual conflict of interest exists when . . . the attorney's representation of the defendant is impaired by loyalty owed to" a former or current client. Jones, 381 F.3d at 119; see Restatement (Third) of the Law Governing Lawyers § 121 (recognizing that a serious problem arises when "there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by . . . the lawyer's duties to another current client, a former client, or a third person"). This is because a lawyer owes an absolute duty of loyalty and confidentiality to both his current and former clients. See United States v. Yannotti, 358 F. Supp. 2d 289, 295 (S.D.N.Y. 2004); United States v. Rahman, 861 F. Supp. 266, 274 (S.D.N.Y. 1994). That duty, which remains in force even after representation ends, precludes the lawyer from disclosing matters revealed to him or her by reason of the confidential relationship, absent release from that duty under the law. Rahman, 861 F. Supp. at 274. In other words, in representing a current client, a lawyer may not use privileged information obtained from another client. See United States v. James, 708 F.2d 40, 45-46 (2d Cir. 1983) (affirming disqualification of defense counsel who previously represented witness and was "potentially in a position to use privilege information obtained during prior representation").

Such a scenario may divide defense counsel's loyalties if, for example, the other client wished to cooperate with the government's investigation, thereby inculpating the defendant, or was otherwise called to be a witness against the defendant. The duty of loyalty counsel owed to his other client would effectively preclude counsel from vigorously cross-examining the other client or commenting on the other client's credibility to the jury, which may be essential to the effective representation of the defendant.[8] A conflict may also arise if the other client has unpaid legal fees, putting the former client and lawyer "in a debtor/creditor relationship, thus undermining [lawyer's] whole-hearted allegiance to [defendant]." United States v. Lussier, 71 F.3d 456, 461-62 (2d Cir. 1995) (noting that a "conflict may also arise when an attorney cross-examines a former client who owes him a fee"). Counsel's assurances alone—that representation of a potential witness or co-conspirator does not present an actual or potential conflict—are insufficient, because counsel cannot know at this juncture "the identity of the Government's witnesses []or the nature of the testimony they will give." United States v. Elder, 311 F. Supp. 3d 589, 597 (E.D.N.Y. 2018); see Wheat, 486 U.S. at 153 ("It is a rare attorney who will be . . . fully apprised before trial of what each of the Government's witnesses will say on the stand.").

Notwithstanding the limitations outlined above, a defendant may be able to waive potential conflicts arising from his or her attorney's prior representation of a potential witness. United States v. Oberoi, 331 F.3d 44, 50 (2d Cir. 2003). Such a waiver may be allowed because:

> Although such a conflict might require a defendant to abandon a particular defense or line of questioning, he can be advised as to what he must forgo; he can then seek the legal advice of independent counsel and make an informed judgment that balances the alteration

---

[8] See Malpiedi, 62 F.3d 465, 467, 469-70 (2d Cir. 1995) (reversing conviction where defense counsel previously advised government witness in connection with grand jury testimony relevant to the trial and was thus precluded from conducting a "thorough, no-holds-barred cross-examination" of the witness at trial); Levy, 25 F.3d at 156 (reversing conviction where counsel was ineffective by virtue of his prior representation of co-conspirator, "still possessed privileged information from his relationship with [co-conspirator] that was directly relevant to [defendant's] defense," and lawyer's "continuing legal and ethical obligations to protect [co-conspirator] and his confidences necessarily meant that [lawyer's] interests diverged from [defendant's]"); United States v. Kelly, 870 F.2d 854, 857 (2d Cir. 1989) (concurring that disqualification was necessary where counsel formerly represented a testifying informant and defendant's interests would best be served by "vigorous cross-examination of the informant in a manner wholly inconsistent with the informant's interests"—a task that defense counsel could not perform without "violat[ing] the rights of the informant" to expect continued loyalty and confidentiality from his former attorney); Schlesinger, 335 F. Supp. 2d at 382-83 (disqualifying counsel and his firm where counsel formerly represented witness in relevant proceeding, who could testify at trial, which "may handicap [lawyer's] ability to cross-examine his former client or negatively comment in closing arguments about [witness's] testimony," or shift blame onto the witness); United States v. Falzone, 766 F. Supp. 1265, 1275 (W.D.N.Y. 1991) (finding it improper for an attorney to cross-examine his prior client because the attorney is in a position to use information gleaned from the prior representation "either purposely or inadvertently").

10

> in the trial strategy against the perceived effect of having to get a
> new and perhaps less effective defense counsel.

Perez, 325 F.3d at 127.  Additionally, the other client may waive attorney-client privilege with prior defense counsel, thereby mitigating the conflict.  See Lussier, 71 F.3d at 462 (rejecting argument that counsel was ineffective given prior representation of a government witness who testified at trial, where witness waived any attorney-client privilege, lawyer represented there were no outstanding attorney fees, and defendant made a knowing and voluntary waiver of the right to conflict-free counsel).

### 3.      Attorney as an Unsworn Witness

A lawyer is generally barred from acting as both an advocate and a witness in the same proceeding.  See Ciak v. United States, 59 F.3d 296, 304-05 (2d Cir. 1995); N.Y. Rules of Prof. Conduct 3.7 (2025).

"[W]hen an attorney possesses first-hand knowledge of events that may be the subject of testimony at trial," he may become a sworn or unsworn witness.  United States v. Liszewski, No. 6-CR-130 (NGG), 2006 WL 2376382, at *3 (E.D.N.Y. Aug. 16, 2006).  For example, when a witness is expected to testify about the actions of counsel that can be interpreted in a way that implicates the client, a conflict of interest exists if the lawyer ought to be a rebutting witness, "either to deny the [action], or to provide an innocent explanation for the jury to consider."  United States v. Cunningham, 672 F.2d 1064, 1074 (2d Cir. 1982) (approving disqualification of lawyer and his firm if district judge determined on remand that testimony of witness was admissible).  Whether or not the lawyer actually testifies, by trying to impeach the witness during cross-examination and by arguing in summation about what the action means, the lawyer becomes an unsworn witness.  Iorizzo, 786 F.2d at 57.  "Indeed, proof at trial about a lawyer's conduct may be such that his very presence at counsel table would itself distort the factfinding process by implying to the jury the court's endorsement or condonation of that conduct."  Schlesinger, 335 F. Supp. 2d at 384 (disqualifying lawyer and firm); see Iorizzo, 786 F.2d at 57 (reversing conviction where defense counsel previously represented government witness in other proceedings that were "clearly relevant to the testimony [the witness] gave at trial," which, inter alia, made counsel himself a likely trial witness and gave counsel the unfair advantage of being an unsworn witness); Wallert, 733 F. Supp. at 573 (disqualifying defense counsel who represented defendant in connection with an allegedly fraudulent loan application, which was expected to be a subject at a trial, because, inter alia, even if counsel was not called, "the inference would be that the loan transaction was proper because approved by him").

Agreeing "to limit inquiry to avoid the problem of counsel as an unsworn witness may be appropriate in some circumstances."  United States v. Kliti, 156 F.3d 150, 156 n.7 (2d Cir. 1998) (reversing conviction for failure for hold Curcio hearing to determine if defendant consented to limiting cross-examination).  In other instances, a stipulation may be used to avoid disqualification of an advocate-witness.  See Torres v. Donnelly, 554 F.3d 322, 326 (2d Cir. 2009) (finding conflict mitigated by stipulation that obviated need for defense counsel's testimony).  However, where defense counsel is entangled in the facts of the defendant's case such that he should either be available as a witness or would, upon remaining as defense counsel, "become an unsworn witness for the accused," it is counsel's ethical duty to withdraw, and upon

failing to do so, counsel should be disqualified, regardless of the defendant's expressed willingness to waive.  Locascio, 6 F.3d at 931-34.  Because the government, not the defendant, is prejudiced, "[w]aiver by the defendant is ineffective in curing the impropriety in such situations."  Id. at 934.

Thus, "[t]he risk that [a lawyer will] become a witness at trial [is] enough alone to allow the district court to reach th[e] determination [to disqualify]."  Jones, 381 F.3d at 120-21 (affirming disqualification of attorney where, inter alia, "the government represented that it was possible that [lawyer] would be a witness in the defendant's trial," notwithstanding that "neither the court nor the parties were assured of the path the trial would take when this decision was made," because if "[lawyer] turn[ed] out to be an actual or unworn witness in defendant's trial, this would be actual grounds for disqualification").

4.      Attorney's Involvement in Wrongful Conduct

An allegation that defense counsel is entangled in the facts of the defendant's criminal conduct may create an unwaivable conflict of interest.  See United States v. Williams, 372 F.3d 96, 103 (2d Cir. 2004).   It is the allegation that creates the conflict, not whether the allegation is "true or false, or with or without some foundation," and indeed the conflict exists even if the attorney is "demonstrably innocent."  United States v. Fulton, 5 F.3d 605, 610 (2d Cir. 1993).  This is because an "attorney's self-interest in avoiding criminal charges or harm to his reputation [are] enough to influence every aspect of his representation of [a] defendant," amounting to an unwaivable conflict.  Jones, 381 F.3d at 120.  Put otherwise, "[n]o rational defendant would knowingly and intelligently be represented by a lawyer whose conduct was guided largely by a desire for self-preservation."  Id.; see United States v. Cancilla, 725 F.2d 867, 870 (2d Cir. 1984) ("What could be more of a conflict than a concern over getting oneself into trouble with criminal law enforcement authorities?").

The Second Circuit has found that defense counsel "concerned about his own misconduct (or perceived misconduct) relating to [defendant's case]" could be impaired in numerous ways including, being "less inclined to encourage [defendant] to cooperate because [defendant] might have implicated [lawyer] in criminal activity"; his "advice about pre-trial decisions, such as plea discussions, also could have been affected"; and his "trials decisions could well have been affected because [lawyer] may have sought to avoid examinations of witnesses who might have exposed him to whatever conduct he was concerned about."  Scala, 266 F. App'x at 45; see Fulton, 5 F.3d at 610 (finding that even if the "allegations are plainly false, the defense is impaired because vital cross-examination becomes unavailable to the defendant"); Levy, 25 F.3d at 156 (finding an actual conflict arises where a lawyer's desire to avoid being called as a witness make him willing "to sacrifice or compromise certain trial strategies and defenses"); United States v. Gambino, 838 F. Supp. 749, 754 (S.D.N.Y. 1993) (finding an actual conflict arises where an attorney "cannot be free from fear that a vigorous defense should lead the prosecutor or the trial judge to discover evidence of the attorney's own wrong doing"); United States v. Gotti, 9 F. Supp. 2d 320, 324 (S.D.N.Y. 1998) ("[T]he attorney's desire to minimize his own involvement in the events in question or to characterize his own conduct favorably creates pressures potentially inimical to his client's interests.").  Moreover, the attorney cannot examine witnesses regarding the allegations against the attorney without in effect becoming an unsworn witness.  Fulton, 5 F.3d at 610.  The lawyer may also be

12

hampered by his desire to "curry favor with the prosecution" and fear "that a spirited defense of [defendant] would prompt the Government to pursue the case against [the lawyer] with greater vigor." Levy, 25 F.3d at 156. Thus, lawyers have been disqualified on this basis.[9]

### 5. Multiple Conflicts

In cases where, as here, multiple conflicts have been raised, the court must consider the conflicts in totality, and not in isolation. See Levy, 25 F.3d at 157 (reversing conviction where multiple conflicts of interest prejudiced defendant, even if any conflict standing alone could have been overlooked); Jones, 381 F.3d at 121 ("We could not expect the district court to rule otherwise [than disqualification] where it seems more likely than not that a number of conflicts will materialize. Whether or not they materialize, defendant [] would have a strong argument on appeal that he had been denied effective assistance of counsel.").

## III. Analysis

### A. Rubin's Payment of Co-Defendants' Attorney Fees

Because a third party is paying the legal fees for Jennifer Powers and Stephen Powers in this case, their respective counsel face potential conflicts of interest. The potential conflict is compounded by the fact that the third-party payor is their co-defendant, Rubin, the head of the sex trafficking organization at the center of this case and Jennifer Powers's boss and benefactor. These circumstances pose inherent dangers in that the payment of legal fees here "may subject [the] attorney to undesirable outside influence" and raises an ethical question "as to whether the attorney's loyalties are with the client or the payor." Locascio, 6 F.3d at 932.

---

[9]    See, e.g., Levy, 25 F.3d at 156 (reversing conviction where government suspected defense counsel had aided a co-conspirator's flight from justice and finding, "[i]f [lawyer's] behavior with regard to [the co-conspirator] was even slightly questionable, he would obviously share a strong personal interest, distinct from [defendant's] interest, in avoiding any exploration of [co-conspirator's] activities"); Jones, 381 F.3d at 120 (finding criminal investigation of lawyer for passing discovery between clients was enough to be a per se unwaivable conflict where the government indicated it was "likely" the lawyer would become a subject of the grand jury investigation); Elder, 311 F. Supp. 3d at 596 (disqualifying counsel where government was investigating what, if any, role counsel played in defendant's ability to avoid apprehension, because "[lawyer] acted in such a way that his conduct is now intertwined with that of the Defendant's with respect to the time period of March 1 through March 7, 2018," as a result of which counsel now "plainly has his own interest in this case—an interest in not having anything come to light that might further complicate his personal situation"); Schlesinger, 335 F. Supp. 2d at 384 (disqualifying counsel and firm where, inter alia, the government intended to show that defendant retained counsel to facilitate distribution of fraudulent documents, and thus counsel and his firm "may have a personal interest in protecting his and the Firm's reputation based on their involvement"); cf. Fulton, 5 F.3d at 610 (clarifying that "baseless threats of disciplinary sanctions against the attorney" for allegedly improper advocacy during trial do not create a conflict).

The primary concern is that this payment structure has the potential to affect defense counsel's advice, including (1) whether to seek possible leniency by cooperating with the government, including against Rubin, and (2) whether to testify in their own defense at trial, where such testimony might implicate Rubin. See, e.g., Wood, 450 U.S. at 269 ("One risk is that the lawyer will prevent his client from obtaining leniency by preventing the client from offering testimony against his former employer or from taking other actions contrary to the employer's interest."); Amiel v. United States, 209 F.3d 195, 198-99 (2d Cir. 2000) (reasoning that if trial counsel advised defendant not to testify even though testifying was in the best interests of the defendant, to avoid inculpating the payor of counsel's fees, "these facts . . . would entitle appellant to relief [on an ineffective assistance claim] on the ground that trial counsel abdicated his duty of loyalty by permitting a third party who paid his fees to influence his professional judgment in representing [the defendant]"). In addition, based on their disclosures to Pretrial Services, it is not clear what alternative funds Jennifer Powers and Stephen Powers have to pay their attorneys. Counsel for Rubin advised the government that Rubin is paying the fees on an ongoing basis and has the ability to stop paying his co-defendants' fees at his discretion.

Accordingly, the government respectfully requests that the Court inquire further to determine, as to Jennifer Powers and Stephen Powers, whether the payment of their respective legal fees by Rubin presents a conflict; the nature and extent of that conflict; and whether it is one that may be waived.

B.    Conflicts Involving Representation of Potential Witnesses

Both Rubin and Jennifer Powers's lawyers have represented or are representing potential witnesses who were involved in several aspects of the criminal case that are likely to be subjects of the criminal trial, creating a risk of conflict. Specifically, Jennifer Powers's lawyers' colleagues at Schlam Stone & Dolan LLP previously represented Schnur in her Defamation Case and related proceedings; Rubin's lawyer Mr. Gilbert of Sheppard Mullin presently represents Schnur in the Defamation Case; and Rubin's lawyer Ms. Kirshner's firm, Clayman Rosenberg Kirshner & Linder, LLP, has been representing Subject-1 since 2024, after she was served by the government with grand jury subpoenas.

Both Schnur and Subject-1 were witnesses to activities that are very likely to be subjects of the criminal trial, creating a consequent likelihood that they may be trial witnesses. As detailed above, Schnur, both prepared settlement paperwork for Jane Doe #4, whose breast implants were so badly damaged after Rubin's beating that they required medical attention to correct, and was apparently prepared to receive "any and all" information about ███████ s criminal case with ████████—to which case neither Rubin nor Jennifer Powers was a party, and for which Rubin repeatedly proposed bribing ████████ to prevent negative information about him and Jennifer Powers from being revealed during the course of the case, demonstrating his consciousness of guilt. Additionally, the same evening Schnur received a draft of the Civil Case complaint, Jennifer Powers engaged in obstructive conduct, contacting 1-800-GOT-JUNK to clean out the Penthouse, where much of the criminal conduct occurred. Finally, given Schnur's historical representation of both Rubin and Jennifer Powers in connection with at least certain aspects of the criminal conduct at issue here, it is possible either may seek to pursue an

14

advice-of-counsel defense and waive privilege, thereby placing Schnur's advice at issue in the case and converting her into a potential fact witness.[10]

As to Subject-1, beyond receiving approximately $200,000 from Rubin and engaging in a commercial sexual relationship with Rubin over a years-long period, she was also witness to at least two incidents involving Jane Doe #10, about which Jane Doe #10 and Rubin offered conflicting testimony during trial in the Civil Case. See supra p.3. Subject-1 is a subject of an ongoing grand jury investigation concerning Rubin and Jennifer Powers's trafficking network, and has indicated her intent to invoke the Fifth Amendment right against self-incrimination, demonstrating her own belief that she has criminal exposure.

Schlam Stone & Dolan LLP owe an absolute duty of confidentiality to both Jennifer Powers and Schnur; Sheppard Mullin owes an absolute duty of confidentiality to both Rubin and Schnur; and Clayman Rosenberg Kirshner & Linder owe an absolute duty of confidentiality to both Rubin and Subject-1. See Hempstead Video, Inc., 409 F.3d at 135 (finding that such conflicts are ordinarily imputed to an entire firm); Schlesinger, 335 F. Supp. 2d at 384 (disqualifying lawyer and firm). Whatever alignment may exist at present among Schnur or Subject-1 and the defendants, promising lines of defense may emerge that force their interests to diverge, including cooperating with the government's investigation or crafting arguments that emphasize the relative culpability of each individual. To the extent those strategies are incompatible with the duties the respective defense counsel owe to their current and former clients, defense counsel would be precluded from pursuing such lines of defense on the defendants' behalf. See Holloway v. Arkansas, 435 U.S. 475, 490 (1978) (observing that "in a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to refrain from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process"). Moreover, to the extent Schnur or Subject-1 were to be called as a witness (whether by the government or defense), and unless they waived attorney-client privilege, counsel would be precluded from betraying the confidences or loyalty owed to them during cross-examination, which might require the defendants to retain independent counsel to prepare and conduct the examinations, or alternatively to forego lines of cross-examination entirely. See supra n.8 (detailing numerous cases in which counsel were disqualified on the basis of, inter alia, conflicts arising from prior representations).

The fee arrangements between Schnur, Subject-1 and their respective lawyers may also create a conflict. See Lussier, 71 F.3d at 461-62 (identifying conflict where former client and lawyer are in a "debtor/credit relationship" and lawyer "cross-examines a former client who owes him a fee"). Schnur's legal fees in the Defamation Case are being funded by Rubin, which she apparently must repay Rubin at some juncture. It is unclear what, if any, fees are outstanding. It is likewise unclear what, if any, fee arrangement has been agreed as to Subject-1 and whether her legal fees are outstanding.

---

[10]    At present, the government has no indication that the defendants will pursue an advice-of-counsel defense as to any of the matters addressed herein, or that such a defense is legally available to them. The government reserves the right to challenge the propriety of any such defense at an appropriate time, if necessary.

15

Therefore, the government respectfully requests that the Court inquire further to determine: (a) as to Jennifer Powers, whether Schlam Stone & Dolan LLP's former representation of Schnur creates a conflict that is imputed to her present counsel; (b) as to Rubin, whether Clayman Rosenberg Kirshner & Linder, LLP's current representation of Subject-1 is imputed to his lawyer, Ms. Kirschner; (c) whether any of the following creates an actual or potential conflict of interest: Schlam Stone & Dolan LLP's former representation of Schnur, Sheppard Mullin's current representation of Schnur, and Clayman Rosenberg Kirshner & Linder, LLP's current representation of Subject-1; and (d) the nature and extent of any such conflict, including whether it is waivable.

C.     Rubin's Lawyers' Involvement in Sending a Threat Letter to Jane Doe #5

Rubin's lawyers' involvement in and apparent blessing of the Threat Letter sent to Jane Doe #5 creates the risk that one or more of his lawyers becomes an sworn or unsworn witnesses at trial, and may separately impede the lawyers' representation of Rubin given concerns of disciplinary or reputational harm.

As discussed above, in 2019, Rubin sent the Threat Letter to Jane Doe #5's parents' house by FedEx and registered mail, and separately sent Jane Doe #5 a text message to persuade her not to file a lawsuit against him. Rubin threatened to malign her reputation by testifying that she was a "professional prostitute" and to pursue sanctions. At the time, Jane Doe #5 was represented by counsel. Rubin was also represented, including by Mr. Gilbert, then with Dechert LLP. Rubin's lawyers reported in connection with detention proceedings in the instant case that unnamed members of Rubin's legal team at Dechert LLP saw the Threat Letter before it was sent in 2019, and have since argued that there was nothing improper about it. Moreover, Rubin's lawyers did not provide any forewarning to Jane Doe #5's counsel concerning the contact. While Rubin is no longer represented by Dechert LLP, see ECF No. 74, at least one of his lawyers (Mr. Gilbert) as at Dechert LLP in 2019 and continues to represent Rubin.

Given Rubin's lawyers' apparent blessing of the Threat Letter sent to Jane Doe #5, Rubin may seek to invoke an advice-of-counsel defense and waive privilege, thereby placing his lawyers' advice at issue in the case and converting counsel into potential fact witnesses. If in doing so, Rubin or the government called his defense counsel to testify, an actual conflict would arise. See N.Y. R. Prof'l Conduct § 3.7(a) (prohibiting an attorney from acting both as an advocate and a fact witness); see also Kliti, 156 F.3d 156 (finding that trial counsel "testifying on behalf of his client . . . would result in his disqualification"). Even if Rubin advanced such a defense without his lawyer testifying, his lawyer would nonetheless become an unsworn witness. For example, if defense counsel seeks to minimize the force or intent of the Threat Letter, or argue for a particular interpretation of its meaning, his argument may be "given added credibility" due to his contemporaneous blessing of the Threat Letter. See Locascio, 6 F.3d at 934. This situation would give Rubin "an unfair advantage, since [defense counsel] would not have had to take an oath in presenting his interpretation, but could merely frame it in the form of legal argument." Id. Here, the defendant cannot simply cure impropriety through waiver, since he is not the party prejudiced. Id. Rather, he would have to agree to forego any defense that the Threat Letter was approved by his counsel to mitigate the conflict, and even still, his lawyer's presence at counsel table may nonetheless imply to the jury that the court endorsed or condoned that conduct. See Schlesinger, 335 F. Supp. 2d at 384.

16

The Threat Letter creates a further potential conflict insofar as it could lead to, for example, disciplinary sanction or reputational harm.  The New York Rules of Professional Conduct applicable in 2019 provided, in relevant part: "a lawyer may cause a client to communicate with a represented party . . . provided the lawyer gives reasonable advance notice to the represented person's counsel that such communications will be taking place."  N.Y. Rules of Prof'l Conduct 4.2 (2017).   The rules further provided: "In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass or harm a third person or use methods of obtaining evidence that violate the legal rights of such a person."  Id. 4.4(a).  Here, the Threat Letter threatened to malign Jane Doe #5's reputation should she pursue litigation against Rubin, embarrassing and harassing her, and moreover threatening to pursue sanctions if she pursued legal recourse (as was her right).  Additionally, defense counsel knew or should have known that Jane Doe #5 was represented, given their understanding that a lawsuit against the defendant was imminent—and indeed she was represented—but no forewarning was provided to her counsel.   As the Second Circuit has recognized, where a lawyer's behavior "was even slightly questionable, he would obviously have a strong personal interest, distinct from [defendant's] interest, in avoiding any exploration" of those activities, such as through certain questioning or defenses.  Levy, 25 F.3d at 156.  Thus, given the prospect of disciplinary action or reputational harm, defense counsel's advice to Rubin in the instant criminal case may be tainted by self-interest.

Accordingly, the government respectfully requests that the Court inquire further, as to Rubin, whether Dechert LLP's apparent blessing of the Threat Letter presents a conflict of interest, whether that conflict is imputed to Rubin's present counsel, Mr. Gilbert—who was then at Dechert LLP and who is now at Sheppard Mullin, the nature and extent of that conflict, and whether it is one that may be waived.

IV.    Conclusion

For the foregoing reasons, the government respectfully requests that the Court inquire into the conflicts and/or potential conflicts identified above to determine the nature and extent of any conflicts that exist, in isolation or together, and whether such conflicts are waivable.  To the extent the Court finds a conflict waivable, the government respectfully requests that the Court appoint separate Curcio counsel for the relevant defendants, with whom they may consult, and schedule a Curcio hearing to advise the relevant defendants of their respective rights to conflict-free representation and determine if they waive those rights.  In advance of any such hearing, the government will furnish proposed examinations as to each conflict the Court

17

determines to be waivable.  To the extent additional conflicts of interest become apparent, the government will promptly notify the Court.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney


By: _____/s/_____

Kayla Bensing
Tara McGrath
Raffaela Belizaire
Assistant U.S. Attorneys
(718) 254-7000


cc:    Clerk of Court (BMC) (by ECF)
       Counsel of Record (by ECF)

18